IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**BOBBY TATUM, K69478,** )
)
**Plaintiff,** )
)
**vs.** ) **Case No. 21-cv-1697-DWD**
)
**C/O WILLIAMS,** )
**Defendant.** )

# MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Bobby Tatum, brought this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while at Shawnee Correctional Center (Shawnee). Plaintiff alleges that on May 20, 2021, Defendant Williams conducted an overly invasive strip search before he allowed Plaintiff to attend an attorney visit. (Docs. 2, 14). The Court reviewed the written pleadings on the exhaustion of administrative remedies (Docs. 53, 54, 56) and determined that there were genuine disputes of material fact that warranted an evidentiary hearing. (Doc. 67). The Court ultimately held two evidentiary hearings on December 7, 2023, and January 16, 2024. After hearing from the parties and reviewing the evidence, the Court finds that Plaintiff failed to exhaust his administrative remedies, so this case is dismissed in full without prejudice.

## BACKGROUND

Plaintiff signed his complaint on August 31, 2021. (Doc. 2 at 8) Upon initial review, the present case was severed from another (21-cv-1101-NJR), and Plaintiff was allowed to proceed on one claim:

Claim 1: Eighth Amendment cruel and unusual punishment claim against C/O Williams for the invasive strip search.

(Doc. 14 at 2).

In the Motion for Summary Judgment, Defendant Williams argued that Plaintiff never submitted any grievances relevant to the claim presented in this lawsuit. (Doc. 54). In response, Plaintiff argued that he attempted to submit a grievance on May 21, 2021, but he never got a response. (Doc. 56). After waiting at least 60 days for a response, he corresponded with the Administrative Review Board (ARB) about his lost grievance on August 20, 2021. Plaintiff argued that per the Shawnee Offender Manual, sending a request slip or grievance to Springfield was sufficient for exhaustion. The Court found that on paper, it could not resolve the dispute between the parties about the potential existence of the May 21, 2021 grievance. (Doc. 67). The matter was set for an evidentiary hearing, and Plaintiff sought witnesses to testify on his behalf. The Court reviewed Plaintiff's evidence concerning his proposed witnesses, and ultimately determined that only one of the three witnesses—Dontrell Logan—had testimony that would be relevant to the material dispute about exhaustion. (Doc. 91).

Based on this finding, the Court issued a video writ to secure Logan's appearance for the evidentiary hearing. On the day of the hearing, the Court was informed that Logan was unavailable because he was away from the prison on an emergency medical writ. Given Logan's unavailability, the Court took the testimony of the other available witnesses (Plaintiff, and Kimberly Martin) and it left the record open to take further evidence from Logan. (Doc. 98). Between the first hearing on December 7, 2023, and the

second hearing on January 16, 2024, Plaintiff filed two motions to compel judgment (Docs. 99, 104). He appended an excerpt of the Shawnee Offender Manual to the first motion, which contained information on how an inmate could report a sexual assault. (Doc. 99 at 6). In the second motion, he expressed concern that Logan's testimony had been tainted. (Doc. 104). On January 16, 2024, Logan was present in the witness waiting room, but Plaintiff confirmed on the record that he did not wish to call Logan.[1] (Doc. 106). As such, the Court closed the evidence and heard final statements from the parties. Against this backdrop, the matter is now ripe for decision.

## FINDINGS OF FACT

Plaintiff was called by defense counsel at the Pavey hearing, and he testified on his own behalf. Plaintiff testified that he filed a grievance at Shawnee on May 21, 2021, but after filing that grievance, he did nothing at the facility level to follow-up on it. He filed the grievance by placing it in the locked box on the wall of his housing unit. He testified that he makes handwritten copies of everything that he drafts at the prison, but he also admitted that he made no handwritten copy of the May 2021, grievance. Plaintiff explained that he became uneasy about the situation at the prison, so rather than inquire further, he filed a grievance directly with the Administrative Review Board (ARB) in August of 2021. Plaintiff admitted that he did not get a response from the ARB to his grievance until September 7, 2021, *after* he had filed the lawsuit from which this case was severed (Case No. 21-cv-1101). Although the response from the ARB provided steps that

[1] If Logan had testified consistent with his own affidavit that Plaintiff submitted in support of his original complaint, then Logan would have presumably stated that he also experienced an invasive strip search on June 18, 2021, and he attempted to grieve the matter but his grievance never got a response. (Doc. 2 at 16).

he could take with regards to his claim at Shawnee, he never filed anything further at Shawnee about this incident.

Plaintiff's grievance that he transmitted to the ARB, and the ARB's response, were both provided as exhibits to the original summary judgment motion. In the transmission to the ARB, Plaintiff complained about missing grievances from 2019 and 2020 concerning the conditions of confinement, and he also complained that he had filed a grievance about the May 20, 2021, strip search by C/O Williams, but he had not gotten any response. He described the search as "naked XXX rated strip searchs in which I felt violation," by C/O Williams. (Doc. 54-6 at 10). He indicated he believed his grievance officer had not processed his grievance about this issue. (*Id.*). The ARB received this grievance on September 3, 2021, and responded on September 8, 2021, with a "return of grievance" form. (Doc. 54-6 at 8). On the form, the reviewing official checked boxes for additional information. Boxes were checked to provide the original grievance and counselor's response, as well as the grievance officer and CAO's responses, if timely. The official also checked a box and indicated Plaintiff should contact his counselor or Field Services regarding prior grievances. In closing, the official indicated all grievances received by the ARB had been answered.

At the Pavey hearing, Defendant also called Kimberly Johnson, the grievance office supervisor at Shawnee. Ms. Johnson testified that she was previously a grievance officer at Shawnee until April of 2023 when she was promoted to supervisor. She described the grievance process with great detail. Grievances at Shawnee and in the IDOC go through three levels of review: (1) counselor review; (2) grievance officer

review; and (3) ARB review. At Shawnee a grievance concerning a sexual assault or a PREA (prison rape elimination act) issue goes straight to the second level of review (grievance officer review). An inmate may also go straight to the third level of review with the ARB for claims about: issues at other prisons (other than personal property or medical care); the forced administration of psychotropic medication; or issues pertaining to protective custody.

Each time that a grievance is received at Shawnee a grievance is logged and a "champs" receipt is generated. The receipt is transmitted to the inmate so that he is aware his grievance has been received. The grievance office has an office coordinator whose sole responsibility is to keep logs of grievances and to generate receipts. The grievance office can receive upwards of 300 grievances per month. They endeavor to process grievances within 60 days, but slow downs can occur due to extenuating circumstances.

Ms. Johnson testified that specific to Plaintiff, the Shawnee log of his grievances did not reflect any submissions in May of 2021. The log that Ms. Johnson testified to was submitted in support of summary judgment. (Doc. 54-3). It did not reflect any grievance received in May of 2021, but it did reflect other grievances that were processed thru all levels of review at the prison both in 2021 and in years before and after. (Doc. 54-3 at 1).

On summary judgment, Defendants also submitted Plaintiff's cumulative counseling summary, which tracks the receipt of grievances, and inquiries by an offender, among other things. (Doc. 54-5). The cumulative counseling log does not reflect any grievance in May of 2021, nor does it reflect any inquiries by Plaintiff about the status of any such grievance. (Doc. 54-5 at 3).

On cross examination, Ms. Johnson agreed that there is no time limit imposed on grievances about a PREA incident. She also stated that per Shawnee's inmate manual, PREA claims may be transmitted directly to Springfield.

An excerpt of the Shawnee manual that Plaintiff submitted indicates that to report sexual abuse, an inmate may: 1) talk to anyone they feel comfortable with; 2) send a note, request slip, or grievance via facility mail; 3) report the incident to the PREA hotline; or, 4) write to the IDOC at 1301 Concordia Court, Springfield, IL 62794-9277. (Doc. 99 at 6).

## CONCLUSIONS OF LAW

A. Legal Standards

The Prison Litigation Reform Act (PLRA) provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 544 F.3d 739, 740 (7th Cir. 2008). "The exhaustion requirement is an affirmative defense, which the defendants bear the burden of proving." *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). For a prisoner to properly exhaust his administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). "[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies." *Id.* at 1024. However, "if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting," then the grievance procedure becomes unavailable. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir.

2006) (finding that an inmate who placed a timely ARB appeal in his chuckhole for mailing, but whose grievance was apparently lost, did all that he could to follow exhaustion procedures).

As an inmate in the Illinois Department of Corrections (IDOC), Plaintiff must follow the grievance process outlined in the Illinois Administrative Code. 20 ILL. ADMIN. CODE § 504.800, et seq. (2017). Under IDOC's procedure, an inmate initiates a grievance with his counselor, and he may then submit his grievance to a grievance officer at his facility, and to the CAO at his facility. 20 Ill. Admin. Code § 504.810(a). Generally, grievances must be filed within 60 days after the discovery of the incident grieved. However, a grievance concerning sexual abuse shall be sent directly to the grievance officer, and grievances related to sexual abuse are not subject to any filing time limit. 20 Ill. Admin. Code § 504.810(a). The Grievance Office shall review a grievance and make a recommendation to the Chief Administrative Officer (CAO) within two months of receipt whenever reasonably feasible. 20 Ill. Admin. Code § 504.830(e). If an inmate is unsatisfied with the outcome at the facility he must appeal to the ARB within 30 days. 20 ILL. ADMIN. CODE § 504.850(a).

Apart from the procedures initiated at the prison, an inmate may submit a grievance directly to the ARB when grieving: decisions regarding protective custody placement; decisions regarding involuntary psychotropic medication; decisions regarding disciplinary proceedings at facilities other than the one where the offender is currently assigned; other issues at facilities other than the offender's current facility (excluding personal property or medical issues). 20 Ill. Admin. Code § 504.850(a).

In the Seventh Circuit, after holding a *Pavey* evidentiary hearing on the exhaustion of administrative remedies, the Court may "determine credibility, resolve disputes, and find facts." *Pavey v. Conley*, 663 F.3d at 904. There are two issues to resolve at the *Pavey* stage of litigation. The Court must determine whether there is a dispute as to the availability of the grievance procedure, and if there is, that issue must be resolved first. Second, if the grievance process was available, then the Court must determine if the inmate took the appropriate steps to exhaust his grievance.

The Seventh Circuit has emphasized many times in recent years that a district court must consider the availability of administrative remedies prior to consider the merits of an inmate's efforts to exhaust his remedies. An "available" remedy is one that is "capable of use for the accomplishment of a purpose" and "is accessible or may be obtained." *Crouch v. Brown*, 27 F.4th 1315, 1320 (7th Cir. 2022) *citing Ross v. Blake*, 578 U.S. 632, 642 (2016). A remedy is "unavailable" if: an administrative scheme is so opaque or confusing that no ordinary prisoner can discern or navigate it; an inmate's access to an administrative scheme was impeded by machination, misrepresentation, or intimidation from prison officials; or, if a procedure is available but it is a dead-end because officials are repeatedly unwilling to provide the relief sought. *See e.g., Wallace v. Baldwin*, 55 F.4th 535, 542 (7th Cir. 2022).

The classic case that many inmates cite for unavailability is *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). If the administrative authority has the ability to take *some* action in response to a grievance, then the remedy is available under the PLRA. *Id.* If prison employees do not respond to a properly filed grievance, or otherwise use

affirmative misconduct to prevent a prisoner from exhaustion, then the remedy is unavailable. *Id.* In *Dole*, the Seventh Circuit found that an inmate did all that he could to exhaust when he gave a proper appeal to a guard for mailing to the ARB, but it got lost in transmission to the ARB, and there were no clear steps for him about what to do if a grievance was lost. The *Dole* Court indicated its holding was narrow, "it is possible that our holding would be different if the ARB had given Dole instructions on how to proceed and Dole had ignored or improperly followed those instructions, that is not the situation here." *Id.* at 811. The *Dole* Court also noted that the inmate had no means of being alerted that the ARB did not receive his appeal in time to file a new timely complaint, because there was no receipt system in place. *Id.* at 810.

Unavailability premised on the affirmative acts of prison staff has also been considered more recently in *Gooch v. Young*, 24 F.4th 624 (7th Cir. 2022), where the Seventh Circuit found that the prison staff's refusal to give an inmate the requisite form to lodge a grievance made the process unavailable. In *Gooch*, the Court also found that threats from staff concerning Plaintiff's safety added a layer of intimidation that thwarted access to the grievance process.

The Seventh Circuit has also found that the grievance process can be unavailable based on the complexity or obscure nature of the process on many recent occasions. In *Hernandez v. Dart*, 814 F.3d 836, 842-43 (7th Cir. 2016), the Seventh Circuit found that a county jail grievance process was unavailable to an inmate who had not been informed of the grievance process while he was hospitalized after an incident of excessive force. The *Hernandez* Court noted that availability can involve more than affirmative

misconduct and can also include instances when the proper grievance procedure is hard to follow or has not been clearly explained. "The prison cannot shroud the prisoner in a veil of ignorance and then hide behind a failure to exhaust defense to avoid liability." *Id.* at 842. In two more recent decisions on jail grievance procedures, the Seventh Circuit found that the responses from the jail to the first level grievance left it unclear if the inmate should immediately appeal or if he should wait the outcome of an internal investigation (and once that was done if he could appeal that investigation). The Seventh Circuit concluded that because the jail responses to the grievances left it unclear for the inmate what, if any, next steps he could take, then exhaustion was unavailable. *See, Hacker v. Dart*, 62 F.4th 1073 (7th Cir. 2023); *King v. Dart*, 63 F.4th 602 (7th Cir. 2023).

In *Reid v. Balota*, the Seventh Circuit further explained that "[m]ere ambiguity might not make the administrative process unavailable[.]" 962 F.3d 325, 329 (7th Cir. 2020). If there are multiple reasonable interpretations of the process, an inmate should err on the side of exhaustion, but if no ordinary prisoner can make sense of the process, it is then unavailable. *Id.* In *Reid*, the Court found the grievance process was unavailable to an inmate who tried to grieve an excessive force incident but got misleading responses from the prison. On the day of the excessive force, the inmate filed an emergency grievance and a standard grievance. The Warden deemed it not an emergency and returned the grievance. Meanwhile, the Grievance Officer responded to the Plaintiff with a memorandum indicating that the issue had already been submitted to internal affairs, their response was pending, and no further consideration was warranted.

Plaintiff attempted to appeal the outcome of the emergency and the standard grievance to the ARB, but they rejected his appeal because it did not include the standard responses from the prison on the merits. In the rejection, the ARB checked boxes indicating that Plaintiff's grievance was missing underlying documentation at the prison level, but the ARB did NOT check the subsequent box inviting Plaintiff to gather those documents and to resubmit, or to explain why he did not have them. Plaintiff then attempted a second emergency grievance at his prison to ask if his original "standard" grievance was still being processed, and he was denied emergency status. On appeal the ARB again checked the two boxes for missing documents, but did not check the box indicating he could resubmit or explain the absence of the documents. The ARB additionally noted that if Plaintiff had not already raised the issues with the counselor and grievance officer, then any subsequent grievance would be considered untimely. Against this backdrop, the Seventh Circuit concluded that both the ARB and the prison obscured the steps to exhaustion for the inmate by failing to invite him to submit additional documents, and by failing to give him clear information about if his original standard grievance was still being processed. 962 F.3d at 330-31.[2] The *Reid* Court also noted that the substance of the ARB's response ignored the fact that Plaintiff complained

---

[2] This Court notes that both *Reid v. Balota*, 962 F.3d 325 (7th Cir. 2020) and *Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828 (7th Cir. 2020) hinged on an assessment of the ARB's handling of appeals of emergency grievances in 2016. In 2016, the Illinois Administrative Code did not yet contain clear directions for what an inmate could do, if anything, to further pursue a grievance that he submitted as an emergency, but that the Warden deemed as not an emergency. In 2017, the Administrative Code was amended to include steps for a grievance filed as an emergency that was deemed a non-emergency. In the *Williams* holding, the Seventh Circuit emphasized that it's holding was narrow based on the change in the Administrative Code, but *Reid* was a subsequent decision and appears to have perhaps broadened *Williams* just a bit. The *Reid* decision focused very little on the history of the Administrative Code, and instead emphasized that the ARB's response to the inmate generated confusion.

that the prison had not properly processed his original standard grievance on the excessive force incident. *Id.* at 330.

In *Smallwood v. Williams*, the Court found that a district court erred when it did not thoroughly examine the issue of availability in light of evidence about the Plaintiff's IQ. *Smallwood v. Williams*, 59 F.4th 306 (7th Cir. 2023). At the end of the *Smallwood* decision, the Court also included a discussion of availability of the grievance procedure based on misinformation the inmate was provided concerning the procedure itself. The Court noted that the prison premised the affirmative defense on the notion that Plaintiff needed to return all the way to the informal grievance step of the process to exhaust a sexual assault claim, but this argument was actually out of step prison's own handbook which stated that sexual assault claims could bypass informal review. The Court further noted that the defendants argued a grievance would be untimely, but that the actual prison handbook imposed no time limit on grievances about sexual assault. Representations of this nature could amount to misinformation that thwarted Plaintiff's access to the procedure.

Finally, in *Wallace v. Baldwin*, the Seventh Circuit recently remanded a case to district court for a more thorough consideration of availability in light of the notion that the grievance process might serve as a "dead-end." 55 F.4th 535 (7th Cir. 2022). More specifically, the *Wallace* Court found that the District Court should have more closely considered and allowed inquiry into whether an inmate who submitted a grievance on double-celling at Menard could actually get a response, or whether a grievance on this issue would be a dead-end. The *Wallace* Court noted that the record contained "some

evidence that other inmates have complained of the same issue that they raise—double-celling at Menard—with no response." 55 F.4th at 544. The Court noted that relevant evidence might include: evidence that the inmate himself had previously filed a grievance with no response, or evidence that other inmates had previously filed grievances on this exact issue with no response. *Id.* at 543.

B. Analysis

The Court held an evidentiary hearing in this case to resolve the dispute between the parties about whether Plaintiff submitted a grievance on May 21, 2021, at the prison concerning Defendant's allegedly improper strip search. At the hearing Defendant presented credible evidence that the grievance process was available to Plaintiff. Plaintiff was well-versed in the requirements of the grievance process. He testified that it was his own practice to always make a copy of grievance documentation that he submitted, but he conceded that he did not have a copy of the alleged May 21, 2021, grievance. He states that he filed the grievance by placing it in a locked box, but that he never inquired about the grievance at the prison again and got no response at the prison.

While these facts *could* suggest unavailability consistent with *Dole* and subsequent cases, the Court heard additional evidence at the hearing that was persuasive and supported a finding that Plaintiff's grievance was not simply lost or confiscated by misconduct of the prison. Specifically, Kimberly Johnson testified about the routine and reliable function of the grievance process at Shawnee. She indicated that the Shawnee grievance process had a receipt and logging system that was well established. Part of this system included the Shawnee internal grievance log, which was submitted with the

Defendants' Motion for Summary Judgment. (Doc. 54-3 at 1). As a redundancy to that log, grievances were also tracked in the cumulative counseling summary (Doc. 54-5), and inmates received "champ" receipts. These mechanisms set the case apart from *Dole*, where the inmate's grievance was accepted for mailing by a prison staff member and then it went missing with no fail-safe mechanism for the inmate to track its progress.

Johnson testified and the grievance log and counseling summary confirm that there was no logged receipt at Shawnee of any grievance from Plaintiff on or around May 21, 2021. (Doc. 54-3 at 1 and Doc. 54-5 at 3). By contrast, these documents do reflect and track the progress of other grievances that Plaintiff submitted and fully exhausted through all levels of review at Shawnee beginning in October of 2021. (Doc. 54-3 at 1; Doc. 54-4 at 5).

The grievance records that the Defendant submitted in support of summary judgment also included a copy of a 2019 grievance that Plaintiff exhausted at all levels of review at Shawnee, and that he properly exhausted all the way to the ARB. (Doc. 54-6 at 11-14). That grievance is likewise included in the grievance log from Shawnee.

Against this backdrop, and with Ms. Johnson's thorough testimony, the Court finds that the grievance process was available to Plaintiff to file a grievance in May of 2021, or any time thereafter, but he simply did not file a grievance about this strip search at Shawnee. The Court is not persuaded that the grievance process was rendered unavailable by any machination or misdeed of the prison.

While the Court finds that the grievance process was available to Plaintiff in May of 2021, and he did not utilize it, Plaintiff also presented another argument that the Court

thoroughly considered and that it will briefly discuss here. Plaintiff contends that the Shawnee Offender Manual provided an alternative avenue to lodge a proper grievance about a sexual assault incident. In the excerpt of the manual that he tendered, the guidance states that an offender may report sexual abuse by speaking to a trusted individual, sending a note or grievance at the facility, calling the PREA hotline, or writing to Springfield. (Doc. 99 at 6). At the hearing, Ms. Johnson confirmed that the manual affords these avenues. She also testified that grievances submitted through the ordinary channels about sexual assault go directly to second level review with the grievance officer and are not subject to a time limit.[3]

So the question becomes, does this guidance in the manual modify or replace the requirements of the standard grievance procedure, and/or does it make the landscape for an offender so confusing or obscure that he could not be expected to comply? These are important questions, particularly in the light of the Seventh Circuit's recent rulings on the availability of the grievance process. As Plaintiff aptly has argued, the Seventh Circuit recently discussed the availability of the grievance process with relation to a sexual assault claim in *Smallwood*.

*Smallwood* found that the grievance process was modified in so much as there is no time limit for sexual assault grievances, and a prison grievance procedure might provide (as it does in this case) that a grievance can skip an informal first level of review

---

[3] The exceptions described by Ms. Johnson model the Illinois Administrative Code.

and proceed to the second level of review. 59 F.4th at 319.[4] The *Smallwood* Court considered the Indiana Department of Corrections grievance procedure, but the Illinois Department of Corrections follows the Illinois Administrative Code, which makes the same exceptions for sexual assault grievances. 20 Ill. Admin. Code § 504.810(a) (sexual abuse complaints shall be sent directly to the grievance officer and shall not be subject to any filing time limit). These subtle modifications to the grievance process have been discussed by other courts that have concluded the PREA *modifies* but does not replace grievance requirements for a grievance concerning sexual assault. *See e.g., Crawford v. Mackellar*, 2023 WL 3655114, * 6 (S.D. Ind. May 25, 2023) (While PREA generally left intact the PLRA's exhaustion requirement, regulations promulgated pursuant to PREA loosened some of the restrictions on what is required of an inmate to exhaust their administrative remedies, citing *Smallwood's* footnote 7); *Poventud v. Saldaris*, 2020 WL 1046095 *3 (E.D. Wisc. Mar. 4, 2020) ("It does not appear that the Seventh Circuit Court of Appeals has addressed the issue of whether a PREA complaint exhausts an inmate's obligation to exhaust under the PLRA, though district courts in this circuit have found that it does not."); *Parry v. Muller*, 2018 WL 4027572 (S.D. Ill. Aug. 23, 2018) (the PREA modifies the grievance process for sexual assault claims by removing the time limit).

There is also the broader question of if the Shawnee manual makes the grievance process for a sexual assault claim opaque and too confusing to follow. While this question could surely be the subject of a good debate, it ultimately does not carry the day on the

[4] *Smallwood* acknowledged that these two exceptions appear in the regulations implementing the PREA, though state corrections facilities are not technically required to adopt the federal PREA. *Smallwood,* 59 F.4th 319, n. 7.

facts before this Court. Even if the Court credits Plaintiff's account that he became afraid to follow-up on his May 21, 2021, grievance at Shawnee and thus decided to go straight to the ARB consistent with the manual, Plaintiff did not afford the ARB hardly any time to respond to him before filing this lawsuit. Plaintiff claims he transmitted his grievance directly to the ARB on August 20, 2021, and he signed the operative complaint in this case (Doc. 2) on August 31, 2021. The ARB returned his grievance just about a week later on September 8, 2021. Under this series of events, even if Plaintiff believed that he could go straight to the ARB, and even if that was true, he did not afford any time for the ARB to take action before filing this lawsuit. A sue first, exhaust later approach has never been acceptable, and it is not satisfactory in this case.[5] *Chambers v. Sood*, 956 F.3d 979, 984 (7th Cir. 2020).

Had Plaintiff waited just a few weeks longer to give the ARB a genuine chance to respond, this case might present a whole host of other questions that are important. Does the Shawnee Offender Manual alter what is required to exhaust a sexual assault grievance, or does it make things confusing? Was the ARB's response to Plaintiff's grievance adequate? Did the ARB's response create confusion or obscure the appropriate path forward? The Court acknowledges that there is recent precedent that could change the outcome of this case had Plaintiff simply waited for the ARB's response. Ultimately, the Court does not need to resolve those questions in the present case. On the narrow set

[5] While Plaintiff failed to exhaust in this case by suing too early, there is no time limit on raising this issue in a properly field grievance in IDOC.

of facts presented, the Court finds that Plaintiff failed to exhaust his administrative remedies in this case, so his complaint must be dismissed without prejudice.

## MISCELLANEOUS MOTIONS

In light of the ruling above on Plaintiff's failure to exhaust administrative remedies, his two Motions to Compel Judgment (Docs. 99, 104) are **DENIED** as **MOOT**.

Plaintiff also has two Motions to Reconsider (Docs. 96 and 97) still pending. Both motions are really secondary attempts to ask the Court to reconsider an earlier ruling on Plaintiff's Third Motion for Counsel (Doc. 91). In the motions, Plaintiff also now expresses a desire to have appointed counsel so that this matter can be converted to a class action[6] on behalf of all other inmates who may also have undergone a strip search by Defendant Williams at Shawnee in 2021. (Docs. 96, 97). Aside from expressing a desire to pursue a class action, nothing in either motion to reconsider provides a basis to alter the Court's earlier rulings on Plaintiff's motions for recruited counsel. Plaintiff has done a competent job of representing himself in this case both via written motions and at the Pavey evidentiary hearings. While Plaintiff may not be a legal expert, he found a cited cases that were highly relevant to his own situation such as *Smallwood*, and he presented evidence that was important to his position, including the excerpt of the Shawnee Offender Manual that he included recently with a Motion to Compel. (Doc. 99 at 6). The Court stands by its previous decisions to deny Plaintiff's Motions for Counsel, and as such, it also now denies Plaintiff's Motions to Reconsider (Docs. 96, 97).

---

[6] On the record at the January 16, 2024, hearing, Plaintiff expressed a desire to withdraw his assertions of a class action, but the Court will still discuss these motions for the sake of completeness.

## DISPOSITION

Plaintiff has failed to exhaust his administrative remedies prior to filing this case, as is required by 28 U.S.C. § 1997(e), so this case is now subject to dismissal without prejudice. Plaintiff's Motions to Compel (Docs. 99, 104), and the motions to reconsider (Docs. 96, 97) are both **DENIED**. The Clerk of Court is **DIRECTED** to **CLOSE** this case and to enter judgment accordingly.

**IT IS SO ORDERED.**

Dated: January 29, 2024

DAVID W. DUGAN
United States District Judge

## NOTICE

If Plaintiff wishes to contest this Order, he can either file a motion under Federal Rules of Civil Procedure 59(e) or 60(b), or he can appeal to the Seventh Circuit Court of Appeals within 30 days of the judgment or order appealed from, FED. R. APP. P. 4(a)(1)(A). The grounds under Rules 59(e) and 60(b) are quite narrow. For example, newly discovered evidence that was not previously available is a basis for relief under either rule, as is a manifest error of law. These rules are not intended as a forum to rehash previously considered arguments. If Plaintiff chooses to appeal to the Seventh Circuit Court of Appeals, he must file a notice of appeal in this Court, and he must pay a filing fee of $505, or apply for in forma pauperis (IFP) status. FED. R. APP. P. 3(a), 3(e). An IFP application must be accompanied by a prison trust fund account statement, as well as an outline of the issues to be presented on appeal. FED. R. APP. P. 24(a)(1)(C). If IFP status is granted, Plaintiff will be assessed a partial filing fee, with the balance due and owing over time regardless of the outcome of his appeal.